UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Steven P. Machia,
             Plaintiff,


         v.                                    Civil Action No. 2:08-CV-103


Michael J. Astrue, Commissioner,
Social Security Administration,
             Defendant.


**OPINION AND ORDER**
(Docs. 10 & 19)

Plaintiff Steven P. Machia is a claimant for Social Security Disability Insurance

benefits (SSDI).  He brings this action against the Social Security Commissioner pursuant

to 42 U.S.C. § 405(g) to reverse the Commissioner's final decision that he is not disabled,

and to remand for a calculation and award of benefits.  Machia filed a Motion for

Summary Judgment on January 8, 2009 (Doc. 10), and the Commissioner filed a Motion

for an Order Affirming the Social Security Administration's ("SSA") Decision on March

17, 2009.  (Doc. 19.)  For the following reasons, the Commissioner's motion is DENIED,

and Machia's motion is GRANTED in part.[1]


**Standard of Review**

_____

[1] The Parties consented to the exercise of jurisdiction by a United States Magistrate Judge on
October 14, 2009.  (Doc. 8.)

In reviewing the Commissioner's decision, the Court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it stands on substantial evidence and the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984).

However, if the "evidence has not been properly evaluated because of an erroneous view of the law . . . the determination of the [Commissioner] will not be upheld." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

## Background

Machia is a 62 year-old Vietnam War veteran who suffers from post-traumatic stress disorder ("PTSD"), anti-social personality disorder, depression, umbilical hernia, diabetes, carpal tunnel syndrome, chronic back, knee, and shoulder pain caused by

degenerative joint disease and severe degenerative arthritis, and other myriad ailments. He is a carpenter by trade, but has not worked in the field since 1992. He subsequently worked as a sawyer at a saw mill until the mill closed in 1995. He alleges a disability onset date of September 16, 1995, and his date last insured is June 30, 1997.

## I.    Procedural History

Machia filed a prior application for a period of disability and SSDI benefits on April 15, 1999, alleging disability due to degenerative bone disease of the left shoulder and legs. (AR 36-39, 77.) His application was denied on July 27, 1999 (AR 36-39), and Machia did not appeal. (AR 103.)

Machia filed the current application on May 3, 2006, alleging that he became disabled on September 16, 1995 because of his orthopedic problems as well as PTSD. (AR 77-79, 90, 97, 701.) His application was denied because it was determined that it raised the same issues decided in his 1999 application. (AR 26-28, 31-33.) Machia timely requested a hearing before an administrative law judge ("ALJ"). (AR 34.) ALJ Edward Hoban held a hearing on October 9, 2007, at which Machia testified and was represented by counsel. (AR 697-720.) The ALJ convened a supplemental hearing on January 10, 2008 in order to receive testimony from Dr. Alfred Jonas, a medical expert, and Richard Hall, a vocational expert. (AR 721-752.) Machia did not appear at this hearing, but his attorney was present and questioned both experts. (AR 723-24.) In a decision dated January 25, 2008, the ALJ reached the merits of Machia's claims, but found that Machia was not disabled at any time from his alleged onset date through June

3

30, 1997, his date last insured.  (AR 14-22.)

The ALJ's decision became the final decision of the Commissioner on April 15, 2008, when the Appeals Council denied Machia's Request for Review.  (AR 4-6.)

## II.    Medical Treating History

Machia began treatment with the Department of Veterans Affairs ("VA") in May 1994.  (AR 537.)  A radiology report on May 23, 1994 indicated "significant degenerative disc disease" in Machia's spine.  (AR 571.)  This observation was confirmed on May 29, 1996, when Dr. Mark Jewett concluded that "Machia does appear to have degenerative joint disease of his shoulders, elbows, and lumbosacral spine with spinal stenosis and secondary disability."  (AR 433-34.)  At that time, Jewett suggested that anti-inflammatory medication might be helpful.  *Id.*

Dr. Gregory Froehlich has been Machia's primary care physician since at least 1995.  His progress notes from October 26, 1995 indicate that Machia's back pain was persisting, but that he was nonetheless able to do four to five hours of "heavy work" before stopping.  (AR 521.)  On August 7, 1996, Froehlich stated that Machia's shoulder "showed several abnormalities," including "arthritis (degenerative joint disease) of the acromioclavicular joints . . . on both sides," and tendonitis.  (AR 428.)  About three months later, on November 8, 1996, Dr. Froehlich indicated that he would prescribe percocet for Machia's chronic lower back pain.  But his notation also suggests that Machia was relatively active at the time, saying that the anti-inflammatory medication Indocin helped with Machia's pain after "rigorous exercise."  (AR 501.)

4

The following year, and just two weeks prior to Machia's date last insured, a letter from Froehlich indicates that Machia continued to complain of shoulder pain, and that an injection he had was not helpful. (AR 430.) Froehlich suggested that Machia speak to orthopedists about surgery options. *Id*. A few months later, in September 1997, Machia remained on percocet for chronic shoulder and back pain, but was using it "sparingly." (AR 482.) Machia was also referred to physical therapy to treat his shoulder during this time (AR 489, 484-85), but he did not attend his scheduled appointments. (AR 478, 480, 541.)

In early 1998, Froehlich's notes indicate that Machia grew beans and vegetables in his garden over the summer, but that pain rendered it "hard to rototill." (AR 474.) It was also noted that Machia's umbilical hernia was "enlarging and painful." *Id*.

On February 25, 1998, physician's assistant Daniel Duffy examined Machia. Duffy commented that Machia had been unable to work as a carpenter because of musculoskeletal problems. Upon physical examination, Duffy observed that Machia's posture and gait were normal. *Id*. Duffy also specifically noted Machia's bilateral carpal tunnel syndrome, which was "well documented in his chart with [an electromyogram ("EMG")] showing moderate to severe median nerve compression." Duffy noted that Machia was scheduled for a "release"–a surgical procedure in which pressure on the median nerve is relieved by cutting, or "releasing," the carpal ligament in the hand–the following month (March 1998). (AR 614.)

With regard to physical activity, Machia self-reported to Duffy that he could do

two hours of mild labor before back spasms and pain required him to rest. (AR 613.) He did not state how long he required rest before returning to work. He also said that he "currently makes a small living by gardening a 4,000 square foot garden," and had not worked as a carpenter since 1992. (AR 611.) Duffy said that "it seems unlikely that he will be able to pursue his previous life's vocation [in carpentry] and retraining is in order." (AR 615.)

Machia first sought mental health treatment in April 1999. Dr. Froehlich started Machia on a course of the antidepressant sertraline (Zoloft) and referred him to Dr. Lindy Nagy for a psychiatric evaluation. (AR 380.) On May 24, 1999, Nagy wrote that Machia complained of a thirty-year-long negative attitude and inability to get along with others. Nagy's "initial impressions" were that Machia suffered from personality disorder, PTSD, and "longstanding" major depression. *Id.*

Machia visited with Nagy again for an evaluation on July 9, 1999. She noted that Machia was "testy" but able to engage well enough to complete the assessment. (AR 379.) She observed that Machia has a "very bright affect" regarding fishing and his appetite is "ok." She also noted, however, that he has a "longstanding irritability with easily triggered anger and anxiety to minor stimuli[.]" *Id.* For treatment, Nagy suggested an anger and stress management program. Machia was ambivalent about the program but agreed to the referral. *Id.*

A month later, on August 17, 1999, Machia saw Dr. Froehlich for a routine visit. Machia reported that his anxiety, anger, and "hair-trigger temper" persisted. Physically,

his shoulder pain, low back pain, and left knee pain also continued unabated.  (AR 378.)

Machia also reported problems tolerating Zoloft, and said he stopped taking the

medication.  With regard to activity, Machia spent the summer raising beans and corn.  *Id*.

On that same day, Dr. Michael Upton examined Machia for PTSD.  (AR 398.)

Machia complained of violent nightmares and difficulty sleeping, and discussed his

experience in Vietnam as the origin of his symptoms:

> I spent all of my time alone in a bunker in Vietnam.  We got rockets fired
> over our heads.  Somebody shot through the compound once and we never
> did find out who did it.  My experience in Vietnam changed me.  It made
> me more reclusive.  I am a lot more irritable.  It caused me to be a lot of
> trouble to everybody I come into contact with.

*Id*.  Machia also described two specific traumatic military experiences: (1) sitting

in a combat zone encampment with rockets flying over head, and (2) spending time on a

ship that was caught in several typhoons, and believing he may drown.  (AR 600.)

Machia described intrusive thoughts, diminished sleep, hypervigilance, nightmares,

shortness of breath, reduced concentration, and physiological responses when reminded

of past traumas.  *Id*.  Dr. Upton found "evidence of a lifelong pattern of maladaptive

interpersonal behavior consistent with an Axis II disorder."[2]  (AR 602).  He believed "that

[Machia's] character pathology is mixed with avoidant and perhaps antisocial traits . . .

[and] that [Machia's] report of his symptomatology meets criteria for Post-Traumatic

Stress Disorder."  (AR 602.)  Upton concluded that "approximately 50% of the veteran's

_____

[2]  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*
26-27 (4th ed. 1994).

disability comes from this Post-Traumatic Stress Disorder and 50% from his personality disorder." (AR 603.) Upton gave Machia a Global Assessment Functioning ("GAF") score of 48 for his level of over-all functioning.[3]

The next day, on August 18, 1999, John Corson, Ph.D. and R. Fred Elliott, MA administered a series of cognitive performance tests and a "psychosocial questionnaire" to Machia. (AR 246-48.) His over all results on the cognitive testing were within, or close to, normal limits. His responses to the psychosocial questionnaire "indicated a great deal of distress in the form of anxiety, depression, and physical pain, " and he scored in the "severe" range on a depression questionnaire (AR 247-48.) His GAF score was 50. *Id.*

On April 9, 2002, Dr. Froehlich wrote a letter on behalf of Machia noting that jury duty would exacerbate his PTSD and personality disorder, and that his "illnesses would impair his ability to function effectively as a juror." (AR 342.)

On May 5, 2003, Machia met with Dr. Rebecca Hirsch for a VA examination. (AR 580.) She noted that he likes to target shoot and went shooting about one week prior. She also explained that since his prior exam "he continued his education by studying small engines on his own," and also enjoyed fishing, and reading. (AR 581.) She said that Machia "endorses poor short-term memory but good long-term memory. He

---

[3] "GAF" is the Global Assessment of Functioning Scale. A GAF score between 41 and 50 is characterized by "serious symptoms," or "any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30-32 (4th ed. 1994). A lower score is more severe and represents reduced functioning. *Id.*

endorses poor concentration and attention unless the subject matter is interesting to him." (AR 582.) In general, Hirsch did not "find a substantial difference in extent of symptomatology" since his 1999 exam with Dr. Upton, but Machia did report an increase in nightmares and flashbacks since the commencement of the war in Iraq. (AR 583.) These conditions–PTSD and depression–persisted in the subsequent years and continue at the present time. (AR 325-27.)

In 2004 and 2006 Dr. Froehlich reported some additional activity in which Machia was engaged. On July 20, 2004, Froehlich noted that Machia was "working at getting his wood in–cutting, splitting 7 cords for the winter," but also mentioned chronic pain, particularly in Machia's feet and back. (AR 301.) And on March 23, 2006, Machia was thinking of driving to Arizona for the summer, and said he may plant a few hills of beans and "Green Hubbard" squash in his garden. (AR 275.)

### III.    Veterans Affairs ("VA") Rating Decisions

On May 13, 1998 the VA found that Machia "is unable to secure and follow a substantially gainful occupation due to disability." (AR 669.) The VA gave Machia a total disability rating of 70% based on non-service connected carpal tunnel syndrome in both hands, degenerative joint disease in both shoulders and hypertension, and a 10% disability rating based on the non-service related impairment of degenerative joint disease in the lumbosacral spine.[4] (AR 670); *see* 38 C.F.R. § 4.1. This rating decision was made

---

[4] "An evaluation of 70% is assigned for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood[.]" (AR 117.)

effective as of January 29, 1998.  The decision was apparently based, in part, on outpatient treatment reports and medical exams from the time in which Machia was insured.  (AR 611-615; 668.)

The VA issued another ratings decision on June 5, 2002.  This decision granted Machia a 30% disability rating for service-connected PTSD effective December 22, 1998.  (AR 137-42.)  This assessment was based on the August 17, 1999 evaluation by Dr. Upton.  (AR 138.)  The 30% rating related to PTSD accounts for the fact that 50% of Machia's psychiatric disability is caused by PTSD, while 50% is caused by personality disorder, and his over-all disability "could be rated as 50% disabling."  (AR 139.)

On May 12, 2003, the VA increased Machia's rating for PTSD to 50% effective January 28, 2003.  (AR 130.)  This increase was based on Dr. Hirch's May 5, 2003 evaluation, which included an increase in PTSD symptoms contemporaneous with the war in Iraq.  (AR 131.)  The decision stated, "[w]e have assigned a 50% disability evaluation for your service connected post-traumatic stress disorder (PTSD) as it caused occupational and social impairments with reduced reliability and productivity."  (AR 131.)

On September 13, 2004, Machia's PTSD disability rating of 50% was continued (AR 121), but it was subsequently increased to 70% on October 5, 2004 with an effective date of June 7, 2004.  (AR 116.)

## IV.    Machia's Testimony

Machia appeared and testified at the October 9, 2007 hearing.  (AR 706.)  He

testified that he has lived alone in a trailer in the woods since 1992.  He heats the trailer with wood, uses a generator for electricity, and has no refrigerator.  (AR 707.)  He has just one neighbor within eyesight who lives "nine hundred and fifty-two feet" away.  *Id*.  He said that he "kind of like[s] being isolated" and that people leave him alone.  (AR 708.)  He said that his daily activities have not changed much since 1995, and that he gardens a little bit, cuts a little bit of wood when he has to, and "things like that."  He stopped hunting in 1992, but did so because "I didn't really need the animal and I didn't like shooting it in the first place."  (AR 712.)

 He has one friend that he sees about every day when he goes grocery shopping, and he visits with his neighbor about once every week or two.  (AR 708-709.)  He was once married, but divorced in 1982.  He has no children.  (AR 716.)  He reinforced his need for isolation, saying that he avoids "barrooms, a lot of restaurants, [and] and public places."  (AR 710.)  He also grocery shops during the middle of the day to avoid children.  *Id*.

As to his PTSD, Machia said that although he was not diagnosed until 1999, he had the same symptoms in 1995.  At that time he also experienced depression and difficulty sleeping caused by these conditions.  (AR 711.)

With regard to his work as a sawyer, Machia testified that his greatest difficulties were caused by physical pain in his back and legs, and that while he may have had a "minor disagreement here and there" with co-workers, he did not find it "real difficult" to interact with his coworkers and supervisors.  (AR 712.)  Since losing that job Machia has

"mowed some lawns, built a fence, [and] painted a wall on a house" over a ten year

period. (AR 717.) Machia's testimony was cut short when the ALJ decided he would

hold a second hearing to hear from a medical expert. The ALJ sought input from

Machia's counsel on this decision, and counsel advised that, "I have no objection to the

process[.]"[5] (AR 718.) Machia did not attend the second hearing.

## V.     The ALJ's Application of the Five-Step Sequential Evaluation Process

In order to receive benefits, a claimant must be "disabled" on or before his or her

"date last insured" under the Social Security Act. 42 U.S.C. § 423(a)(1)(A). To

determine whether a claimant is "disabled," the regulations require application of the now

familiar five step sequential evaluation process. *Butts v. Barnhart*, 388 F.3d 377, 380-81

(2d Cir. 2004); 20 C.F.R. §§ 404.1520; 416.920.[6] The answer to the inquiry at each step

determines whether the next step's question must also be answered. Step one asks

whether the claimant has engaged in substantial gainful activity since the alleged onset

date of disability; if not then step two asks whether the claimant has any "impairments"

that are "severe";  if one or more "severe impairments" are found then step three asks

---

[5] At the January 10, 2008 supplemental hearing, Machia's counsel said that Machia previously testified "that he can't use a screwdriver, tighten a bolt, or [ ] grip large or heavy objects. With respect to target practicing, that he built a bench so that he puts his gun on the bench for shooting. Then he testified that he hasn't been fishing since about 1999, that he hasn't been doing hunting because he can't walk in the woods, that in terms of walking, that he can walk about 200 feet, and he has to sit and rest." (AR 738.) In fact, such testimony was never elicited during the first hearing, and thus is not currently part of the record. Machia's counsel now concedes this mistake. (Doc. 11 at 15 n.5, 17 n.9; Doc. 21 at 6 n.1.)

[6] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

whether any of these impairments meet or equal one of the listed impairments found in Appendix I of 20 C.F.R. § 404.1599; if an impairment meets or equals a listed impairment then the claimant is deemed "disabled," if not, step four asks whether the claimant retains the Residual Functional Capacity ("RFC") to do his or her past relevant work; and, finally, if the claimant is unable to do prior relevant work, step five asks whether the claimant is able to do any job available in significant numbers in the national economy. *Id*.

In this case, the ALJ found that Machia's date last insured was June 30, 1997, and then dutifully followed this sequential evaluation. (AR 21.) At step two of the process, the ALJ credited Machia with the severe impairments of chronic back, knee, and shoulder pain, carpal tunnel syndrome, personality disorder, and PTSD. (AR 17.) The ALJ did not find that any of these impairments met or equaled a listing, and at step four he found that Machia retained the RFC to do the full range of "medium work,"[7] including his prior job as a sawyer. (AR 21.) Nonetheless, the ALJ continued to step five of the sequential evaluation process, and found that there are a significant number of jobs in the national economy that Machia could perform even if he were limited to "light work."[8] (AR 21-

---

[7] "Medium work" involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, [the Commissioner] determine[s] that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[8] "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

22.)

**Discussion**

Machia principally argues that the ALJ committed legal error by failing to (1) give any evidentiary weight to the VA's disability ratings, and (2) fulfill his obligation to properly develop the evidentiary record.[9]  (Doc. 11 at 22-24, 28-30.)

## I.  The ALJ Did Not Adequately Consider the VA Disability Determinations

On May 15, 1998, the VA determined that Machia is "unable to secure and follow a substantially gainful occupation due to disability," and gave him a 70% disability rating for non-service connected carpal tunnel syndrome, degenerative joint disease in both shoulders, and hypertension.  (AR 669-70.)  This rating was effective as of January 29, 1998, just six months after Machia's date last insured.  *Id.*  The VA issued another decision on June 5, 2002, granting Machia a 30% disability rating for service-connected PTSD effective December 22, 1998.  (AR 137-42.)  The 30% rating for PTSD accounts for the fact that 50% of Machia's psychiatric disability is caused by PTSD, while 50% is caused by personality disorder, and his over-all disability "could be rated as 50% disabling."  (AR 139.)  The VA did not provide a rating for Machia's personality disorder because "[p]ersonality disorders are not considered disabilities under VA law and any disability attributable to a personality disorder is not ratable."  *Id.*

In the Second Circuit, the VA's determination of disability is generally entitled to

---

[9] Machia also makes a number of other arguments, all of which suggest that the ALJ improperly evaluated the medical evidence before him.  (Doc. 11 at 25-34.)  Because the Court remands to consider the VA ratings and to take further evidence, it does not reach the merits of these arguments.

"some weight," though it is not dispositive on the issue of whether a claimant is disabled for the purpose of Social Security benefits. *Hankerson v. Harris*, 636 F.2d 893, 896-97 (2d Cir. 1980).[10] Social Security Ruling ("SSR") 06-03p, *Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 2006 WL 2329939, *7 (August 9, 2006), also states that the Commissioner "should explain the consideration given to [other governmental agencies'] decisions[.]"; *see also* 20 C.F.R. § 404.1504.

As the Commissioner concedes, the ALJ gave "no weight" to these ratings decisions because "no treating or examining physician described the claimant as disabled contemporary with his alleged onset date or through the date he was last insured." (AR 21; Doc. 19 at 6.) The Commissioner argues that this was not legal error because (1) VA ratings are based on a relevantly distinct statutory scheme; (2) the ratings decisions here do not relate to any time before Machia's date last insured; and (3) in any case, the ALJ considered all of the evidence on which the ratings are based. (Doc. 19 at 6-12.)

Of Course, the Commissioner is quite right that the regulations governing the respective disability determinations of the VA and SSA are not identical, and therefore a disability finding by the VA is not dispositive of a claim for Social Security benefits.

---

[10] As Machia points out, other courts of appeals have gone further, holding that VA disability determinations must be given "great" weight by the Social Security Commissioner. *See, e.g.*, *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002); *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984). But the Second Circuit apparently recognizes "the substantial difference in the criteria used in the two programs," and requires the Commissioner to give only "some weight" to VA disability determinations. *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006). Despite this more limited approach, however, the Commissioner is not generally free to completely disregard a VA disability rating. *Id.*

*Compare* 38 C.F.R. § 4.1 et seq. (VA ratings) *with* 20 C.F.R. § 404.1 et seq. (Social Security Disability); 20 C.F.R. § 404.1504 ("[A] determination made by another agency that you are disabled . . . is not binding on [the SSA]."). But this point accomplishes little here, since Machia argues that the ALJ should have given "some weight" to the VA decisions, not that the VA decisions are outcome determinative.

Thus, the issue here is whether the ALJ appropriately gave *no* evidentiary weight to the VA ratings, despite the rule in this Circuit that such ratings are "entitled to some weight and should be considered." *Hankerson*, 636 F.2d at 896-97 (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975)). The Court concludes that he did not.

First, while the 70% disability rating for Machia's orthopedic impairments was made effective about six months after Machia's date last insured, it was based on impairments with which Machia was diagnosed as early as 1994 (AR 428, 430, 433-34), and, more importantly, upon evidence pre-dating Machia's date last insured. (AR 611-615; 668.) Similarly, the VA's June 5, 2002 30% disability rating for Machia's PTSD was made effective about one and one half years after Machia's date last insured, but the VA clearly found—and the Medical Expert agreed— that his PTSD stemmed from events that occurred during the Vietnam War, some thirty years prior.[11] (AR 138-39, 735.) Further, the VA also recognized that half of Machia's psychiatric disability was caused by

---

[11] Subsequent VA ratings increases for PTSD were based, in part, on the determination that Machia's PTSD worsened as a result of the Iraq war in 2003. (AR 130-31, 583.) Such evidence sufficiently distinguishes the ratings from the relevant time period in this case, and thus need not be considered by a future adjudicator.

a "*lifelong* pattern of mal-adaptive interpersonal behavior consistent with an Axis II disorder." (AR 138, 602) (emphasis added). But because the VA does not rate personality disorders, it limited Machia's total rating for psychiatric disability to 30%. As the ALJ correctly recognized during the supplemental hearing (AR 729), the Social Security regulations pose no such limitation.

Because these VA ratings became effective not long after Machia's date last insured, and were based on both impairments and evidence acquired before he lost his insured status, the ALJ was not free to dismiss the ratings as untimely in the absence of evidence showing a disconnect between the VA ratings and the severity of Machia's condition during the relevant time period. There is no bright-line rule in the case law or regulations precluding the consideration of retrospective diagnoses; quite to the contrary, other courts have recognized and applied such diagnoses when, as here, there is corroborating evidence contemporaneous with the claimant's coverage period. For example, this case is similar to *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006), in which the court ordered a remand because the ALJ failed to give "some weight" to a VA disability rating for PTSD made almost four years after the claimant's date last insured. *Id*. at 820. Like *Machia*, Allord did not consult a psychologist or begin formal treatment for his PTSD until after his date last insured. *Id*. But because there was record evidence (lay testimony) linking Allord's PTSD to his coverage period, the Seventh Circuit found

that the ALJ erred by setting aside Allord's VA rating as untimely.  *Id*. at 820-21.[12]

In this case, Machia's testimony, medical records, and the VA ratings themselves, all suggest that the severity of his condition before his date last insured was similar (if not identical) to his condition during the time period for which is VA ratings are effective. Thus, it would unnecessarily and unfairly place form over substance to ignore Machia's VA ratings solely because of the date on which they were made.

Further, the Commissioner cannot avoid remand by pointing out that the ALJ "considered the evidence upon which the VA determination was based[.]" (Doc. 19 at 10.)  As this Circuit has held, the VA determination is itself entitled to at least some evidentiary weight *in addition* to the other record evidence.  While it is obviously important that the SSA consider material evidence upon which a VA determination is based, *see*, *e.g.*, *Gyurko v. Harris*, 487 F. Supp. 1121, 1129 (D. Conn. 1980), a rule requiring nothing more would permit adjudicators to completely ignore VA determinations–a proposition explicitly rejected by this and every other circuit to consider the issue.  *See McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002) ("No circuit has held that an ALJ is free to disregard a VA disability rating.").  The point of the Second Circuit's admonition to accord VA determinations "some weight" is that in addition to the oral testimony and medical evidence, VA rating decisions are another item

---

[12] The court also explained that "contemporaneous corroboration is not *always* required–just usually.  A disease might have a well-understood progression, so that a physician examining a patient at time *t* might have a good idea of what the patient's condition had been at time *t-n*, where *n* was the number of years, prior to the examination, by which time the patient would have had to be completely disabled to be entitled to benefits."  *Allord*, 455 F.3d at 822 (internal citation omitted).

to be placed on the evidentiary scale–an adjudicatory requirement that the ALJ did not satisfy in this case.

Of course, VA rating decisions could be entirely irrelevant, if, for example, they pertain to impairments unrelated to the social security claim, or if there is truly no evidence to link the rating with the claimant's coverage period. But such is not the case here, and it was reversible error for the ALJ to assign the VA ratings zero weight for the stated reason that "no treating or examining physician described [Machia] as disabled contemporary with his alleged onset date or through the date he was last insured." (AR 21.) Accordingly, a "sentence four"[13] remand for further proceedings is warranted in this case. 42 U.S.C. § 405(g).

## II. The Evidentiary Record Should Be Further Developed

Machia also argues that the ALJ committed reversible error by not satisfying his obligation to fully develop the evidentiary record. (Doc. 11 at 28-32.); *see Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) ("It is . . . well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel.") (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (same); 20 C.F.R. § 404.1512 (d) ("Before [the SSA] make[s] a determination that you are not disabled, [it] will develop [the

---

[13] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102 (1991); Fed. R. Civ. P. 58.

claimant's] complete medical history[.]").  In particular, Machia asks that he be given

another opportunity to testify because his initial testimony was incomplete, and he missed

the supplemental hearing because he could not find the building in which it was held.

(Doc. 11 at 30; AR 162.)[14]

The Court agrees that the adjudication of Machia's claim would benefit from a

more thoroughly developed record, and will thus order that the record be supplemented

with additional evidence, including further testimony from Machia.

However, the deficient evidentiary record would not alone be cause for remand

because the current lack of evidence is mainly attributable to Machia's counsel.  *See* 20

C.F.R. § 1740 (explaining the affirmative duty of claimant representatives to promptly

"obtain the evidence that the claimant wants to submit in support of his or her claim").

His counsel voluntarily left Machia's testimony incomplete at the initial hearing and

agreed that it would continue at the supplemental hearing.  (AR 718.)  At the

supplemental hearing, though, counsel erroneously told the ALJ that Machia had already

testified about his pain and daily activities, when in fact he had not.  (AR 738.)  At the

conclusion of the second hearing counsel told the ALJ, "I don't think you need anything

_____

[14] There is some discrepancy in the record as to why Machia did not attend the supplemental
hearing.  In a letter dated January 10, 2008, his counsel stated that he could not find the office building in
which the hearing was held.  (AR 162.)  However, at the hearing his counsel said that Machia chose not to
appear because he was concerned that further testimony about his mental health could jeopardize his right
to own a firearm, and "because everybody already knows he's a fruit loop."  (AR 723-24.)  In either case,
it does not appear that Machia "waived" his right to testify within the meaning of 20 C.F.R. §
416.1450(b), which states that claimants "may send the [ALJ] a waiver or a written statement indicating
that [they] do not wish to appear at the hearing."

else," and confirmed that a decision should be made on the existing record. (AR 751.) As to Machia's testimony, she added, "You have a record of Mr. Machia's testimony . . . you have that on tape." *Id.* Further, Machia now complains that the ALJ did not request Medical Source Statements from his treating physicians, but offers no reason why counsel could not have submitted such documentation on her own initiative, or requested the ALJ's assistance in acquiring the documentation.[15] (Doc. 11 at 29); *see* 20 C.F.R. § 404.1512(d)-(f). While the ALJ has an obligation to develop the medical record in all cases, an abdication of that duty cannot be alleged by counsel who is equally responsible for the deficient record, and upon whom the ALJ reasonably relied.

Notwithstanding counsel's errors, it is clear that additional evidence would facilitate an accurate decision in this case. As already stated, Machia never testified as to the details of his work history, symptoms, and daily activities during the relevant time period. As questions during the second hearing arose, the ALJ remarked that "it hurts that [Machia is] not here . . . to clarify [the record] today." (AR 738.) Further, the opinions of Dr. Jonas suffered because of the incomplete record. Dr. Jonas wanted to know the full extent of Machia's work history between 1990 and 1994 (AR 731), and consistently reiterated that he could not conclusively opine on the severity of Machia's orthopedic impairments, at one point saying, "It was unclear to me, from the record, how impairing this was." (AR 732-33, 735-37.)

---

[15] Indeed, at oral argument counsel stated that–much like the ALJ–she simply did not believe that Medical Source Statements from treatment providers were necessary at the administrative stage.

Dr. Jonas also testified that "it was hard, on the basis of this record, to determine if there were any" episodes of decompensation caused by Machia's mental health impairments, a fact that could be critical to the disability analysis. Given the ALJ's other findings, Machia would have met Listings 12.06 and 12.08–and thus would have been found disabled–if he had "[r]epeated episodes of decompensation, each of extended duration," during his coverage period.[16] (AR 19); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In light of these evidentiary gaps, and the fact that a remand is independently required, the Court orders that a third hearing be held in which the ALJ hears testimony from Machia, a medical expert, and a vocational expert. The Court further directs the Commissioner to request Medical Source Statements describing Machia's functional capacity during the relevant time period (September 15, 1995 to June 30, 1997) from doctors Froehlich, Upton, and Nagy, and that Machia complete the standard Function, Pain, and Work History Reports that are absent from the record because his 2006 claim was initially denied on technical grounds. *Cf. Rosa v. Callahan*, 168 F.3d 72, 78-83 (2d Cir. 1999) (remanding with specific instructions to, among other things, secure additional medical records, request an explanation from a treating physician regarding his disability diagnosis, and reassess the claimant's testimonial credibility).

**III.    The ALJ Erroneously Concluded that Machia Could Return to His Past**

---

[16] There are also some indications that the Medical Expert was not fully prepared to testify. For instance, although it is in the record, Dr. Jonas was entirely unaware that Machia had an EMG relating to his carpal tunnel syndrome (AR 614) until it was pointed out to him by the ALJ. (AR 736-37.) Additionally, Dr. Jonas never explained the significance of Machia's GAF scores, which appear throughout the record, both in the VA ratings decisions and in Machia's treating physicians' notes.

### Relevant Work

Finally, both Parties agree that Machia did not perform his past job as a sawyer at the level of substantial gainful activity and, therefore, this job does not qualify as past relevant work. (Doc. 19 at 28; AR 80-81.) Accordingly, the ALJ erred at step four of the sequential evaluation when he found that Machia was not disabled because he could return to his job as a saw operator. This additional error further necessitates vocational expert testimony, because the ALJ is now obligated to determine if Machia can perform another job available in significant numbers in the national economy. 20 C.F.R. § 404.1560(c).

## Disposition

In certain cases where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," remanding for a calculation of benefits may be appropriate. *Rosa*, 168 F.3d at 83; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper standard," it is appropriate for the Court to order a remand under 42 U.S.C. § 405(g) for a rehearing and further development of the evidence. *Rosa*, 168 F.3d at 82-83 (internal quotation marks omitted).

In this case, Machia has asked the Court to order an award of benefits. (Doc. 11 at 34.) But it cannot be established on the existing record that Machia was disabled prior to

his date late insured, and remand for further proceedings is required so that the ALJ can properly consider Machia's VA ratings, and the administrative record can be adequately developed in accordance with this Opinion.

## Conclusion

For the foregoing reasons, Machia's Motion for Summary Judgment (Doc. 10) is GRANTED in part and DENIED in part, and the Commissioner's Motion for an Order Affirming the SSA (Doc. 19) is DENIED. This matter is remanded to the Social Security Administration pursuant to "sentence four" of 42 U.S.C. 405(g) for further proceedings consistent with this Opinion.

Dated at Burlington, in the District of Vermont, this 16th day of November, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge